Lloyd A. Newton, pro se
Lnewton@stmarytx.edu

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| LLOYD A. NEWTON, | § | |
| *Plaintiff* | § | Case No. 23-CV-002153-JWB-ADM |
| | § | |
| v. | § | FIRST AMENDED COMPLAINT |
| | § | |
| CITY OF ATCHISON, KANSAS | § | |
| CURTIS WHEELER, | § | [Jury Trial Demanded] |
| PHIL BURKE, | § | |
| *Defendants.* | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES
## PURSUANT TO F.R.C.P. 15(a)(1) & K.S.A. CHAPTER 60

### NATURE OF THE CASE

1) Plaintiff Lloyd A. Newton (*Plaintiff*) files this First Amended Complaint against the following Defendants: City of Atchison, Kansas; Curtis Wheeler in his individual capacity; and Phil Burke in his individual capacity.[1]

2) Pursuant to F.R.C.P. 15(a)(1), Plaintiff amends this Original Complaint to drop Lisa Moody, Curtis Wheeler, and Phil Burke in their official capacities.

---

[1] This is the first time Plaintiff has filed a pro se lawsuit. Several times now, Defendants allege that Plaintiff "fails to state a claim or fails to state facts sufficient to state a claim upon which relief may be granted" (e.g., ECF No. 1, at 358). When Defendants summarized Plaintiff's arguments and factual allegations in their Answer (ECF No. 13) and two Memoranda (ECF No. 15 & 17), it occurred to Plaintiff that perhaps he did not make his initial allegations clear or precise enough. Consequently, Plaintiff will attempt to be as precise as possible in what follows, in part so as to make sure that his alleged facts are sufficient enough to state a claim upon which relief may be granted. In doing so, Plaintiff apologizes to the Court if his narrative is overly long and tedious.

3) Plaintiff amends this Original Complaint to add facts and arguments that have come to light since the Original Complaint was filed on April 5, 2023.

4) Plaintiff amends this Original Complaint to add the following causes of actions: Racketeer Influenced Corrupt Organization Act (RICO), codified at 18 U.S.C.A. 1962(c); a *Monell* claim; a Hobbs Act violation, codified at 18 U.S.C.A. 1951; Negligent Hiring, Retention, Supervision, and Training; Blackmail under K.S.A. 21-5428; defamation; and Retaliation of Government Officials for planning to file a lawsuit.

5) In keeping with the Original Complaint, Plaintiff primarily alleges the City and its employees have illegally searched two of his properties in violation of the Fourth Amendment, which guarantees "The right of the people to be secure in their . . . houses . . . against unreasonable searches."

6) In keeping with the Original Complaint, Plaintiff primarily alleges the City and its employees deprived Plaintiff of his Riley Property for fifteen months now in what is essentially a regulatory taking in violation of the Fourteenth Amendment, which promises that no state shall "deprive any person of . . . property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

7) Defendant will argue that the "regulatory taking" is based on the vague and meaningless claim that one of Plaintiff's Properties is "unsafe" and "uninhabitable."

8) However, subsequently to filing the Original Complaint, new information has since emerged showing that Defendants Burke and Wheeler initially decided in March of 2022 to arbitrarily, capriciously, and maliciously deny water to the Riley Property in violation of a clearly defined Constitutional right to property.

9) Furthermore, Plaintiff will show that the City's requirement to hire a structural engineer was also arbitrary and capricious, and was an abuse of their power.

10) As it turns out, the structural engineer's report shows that the structural engineer was not concerned with the safety of the Riley Property (his "only concern" was to have the yard graded).[2]

11) In addition to these violations of federal law, subsequently to Plaintiff's notification to Defendants on November 29, 2022, pursuant of the Kansas Tort Claims Act, the Defendants have violated a number of state statutes and municipal codes.

12) Plaintiff will also show that the City Commissioners voted in January and March of 2023 to proceed towards demolition of the Riley Property without adequate evidence, and thus their decisions were mere pretenses for the City to act under color of City Codes and State Laws.

13) Plaintiff will also show that the City has a policy and history of depriving water service to customers in violation of City Codes.

14) As will be developed at length, there is substantial evidence that shows that the real motivation behind the City's action is its desire to acquire Plaintiff's Riley Property through either eminent domain or extorting Plaintiff into such a weakened financial position that he is forced to sell the property for the purpose of increasing the City's property tax revenue and giving it to either another developer or Benedictine College.

15) To achieve its goals, Plaintiff alleges that the City and its employees are acting *ultra vires* and under the color of local Municipal Codes and State Statues in what has amounted to a regulatory taking of Plaintiff's Property.

---

[2] See ECF No 1, exhibit.

## SUBJECT MATTER JURISDICTION

16) The primary causes of action arise under the Constitution of the United States;

17) Therefore, this Court has jurisdiction under the Constitution, Article III, § 2, and under 28 U.S.C. § 1331.

18) More specifically, this Court has subject matter jurisdiction over this action under the Fourth and Fourteenth Amendments, as well as the above mentioned statutes.

19) In addition, this Court also has subject matter jurisdiction under 42 U.S.C.A. 1983; the Racketeer Influenced Corrupt Organization Act (RICO), codified at 18 U.S.C.A. 1962(c); and the Hobbs Act, codified at 18 U.S.C.A. 1951.

20) Plaintiff seeks damages and injunctive relief arising from the Defendants' use and abuse of State and Municipal Codes and local resolutions.

21) This Court has supplemental jurisdiction over the state law causes of action insofar as those causes arose out of a common nexus of operative facts.

22) While Plaintiff provided notice to the Defendants in June and again in November of 2022 of his intent to bring this lawsuit, Defendants, subsequently to the notices, proceeded to act *ultra vires* and committed further acts against Plaintiff in an attempt to condemn Plaintiff's Riley Property.

23) Because these acts by the City were subsequent to his original notice to the City, the Plaintiff had no way of notifying the City in compliance with the Kansas Tort Claims Act.

## PERSONAL JURISDICTION & VENUE

24) This Court has personal jurisdiction and venue because the causes of action occurred in the state of Kansas;

25) The defendants are, to the best of Plaintiff's knowledge and belief, domiciled in this state, and

26) The real property at issue is situated in this federal judicial district.

## PARTIES

27) Plaintiff Lloyd A. Newton is a citizen of the United States and resides at 1859 W. Summit Ave., San Antonio, Texas, 78201.

28) He may be reached at phone number 913-426-3710.

29)  Or he may be reached via email at LNewton@StMaryTx.edu.

30) Plaintiff Lloyd A. Newton is the owner of 712 N 2nd (Second St. Property).

31) Plaintiff Lloyd A. Newton is the owner of 200 E. Riley, (Riley Property).

32) Plaintiff Lloyd A. Newton is the owner of a duplex at 604 N 2nd (Duplex Property).

33) Plaintiff Lloyd A. Newton is the owner of 106 N 10th (10th St. Property).

34) The City of Atchison is a home rule municipal corporation and political subdivision of the State of Kansas.

35) The City is located in Atchison, County, Kansas, with its primary business located therein, and,

36) The City may be served with process at 515 Kansas Ave, Atchison, KS 66002.

37) Curtis Wheeler is an employee of the City of Atchison and works with code compliance.

38) Phil Burke is also an employee of the City of Atchison and works with code compliance.

39) Based upon knowledge and belief, all the defendants are residents of Atchison, Kansas.

## FACTUAL BACKGROUND

40) Plaintiff incorporates paragraphs 33-43 of his Original Complaint.[3]


## 10TH ST. PROPERTY

41) In February, 2016, Plaintiff was contacted about a sewage problem connected with his rental Property located at 106 N 10th Street, Atchison, KS. 66002.

42) The house at 106 N 10th sits at the top of a small hill.

43) Immediately south of the house was an empty store front, located at 937 Commercial St.

44) Apparently, after the sewage from 106 N 10th left the house, it went under the storefront and then connected to the main sewer line on Commercial street.

45) As it turned out, there was a problem in the sewage line to the south of, and exterior to, the empty storefront, which caused sewage to back up into the empty storefront.

46) Because the City inspectors did not initially know where the problem was, the City chose to terminate the water at 106 N 10th on February 23, 2016.

47) To its credit, the City did send Plaintiff an email on February 22, 2016 notifying him that water was being shut off the following day, February 23, 2016.

48) However, because no one at the time knew the extent of the problem, Plaintiff was forced to evict his tenant immediately because the City turned the water off indefinitely until the problem was solved.

49) The City did not provide the Plaintiff official notice, in the form of a certified letter, or any opportunity to be heard regarding his denial of water service.

---

[3] ECF No. 1, nn. 33-43.

50) As it turned out, the problem was easily fixed a few days later by repairing a broken sewage pipe to the south of the building located at 937 Commercial.

51) Plaintiff recognizes that this incident occurred over seven years ago, and is probably barred by some statute of limitations.

52) However, Plaintiff is not relaying the information about this particular episode to get damages from the rent he lost by having to evict his tenant because the City turned the water off.

53) Rather, he is documenting this episode to show that the City has a history of withholding water services to properties without providing the property owners proper notice or an opportunity to be heard.

54) And to show that the City has a history and or policy of withholding water service to property owners for sewage problems that occurred well outside the boundary of the Property in question.

55) By shutting water off to the Property on 10th Street, the City was acting contrary to the City's Ordinances and Codes, and thus *ultra vires*.


### DUPLEX AT 604 N 2nd

56) From 2005 through July 2021, Plaintiff owned the duplex at 604 N 2nd.[4]

57) The entire duplex only has a single water meter.

58) During that entire 16 year time period, one or another of Plaintiff's tenants purchased water to the duplex, without any objection from the City.

59) However, in July of 2021, Defendants Wheeler and Burke contacted Plaintiff, requiring Plaintiff to install two water meters, one for each side of the duplex.

---

[4] Plaintiff still owns the Duplex.

60) Defendants used the threat of not providing water services to the Duplex if Plaintiff did not comply with installing two meters.

61) Plaintiff objected to installing two meters on a number of grounds, including the exorbitant cost of digging up the yard, running new lines under a concrete porch, ripping out sheetrock on the inside of the Property so as to accommodate two water lines, etc.

62) As Defendant Burke acknowledged in an email dated July 14, 2021, the duplex was "considered an existing non-conforming use," and so any irregularity in the water supply should have been grandfathered in and allowed.

63) At the very least, based on the fact that the City provided water to the house for the past 16 years, Defendants should have been estopped from requiring any sort of major change that would result from installing two meters.

64) Consequently, after pleading with the City inspectors, the City relented and allowed the Plaintiff to purchase water to the entire duplex.

65) Although Plaintiff owns 23 other properties in Atchison, the City does not require the Plaintiff to purchase water for any of his other properties.

66) Rather, the City allows the individual tenants to purchase water service at the other 23 houses.

67) While it is not terribly inconvenient for Plaintiff to purchase the water, he does bear some, albeit *de minimis*, added cost and inconvenience for having to provide water service to the duplex.

68) The point of recounting this episode is not to complain about the utility service at the Duplex, but to document another incidence where the City has a habit of threatening to withhold water service to property owners without the authority of any Codes and thus *ultra vires*.

## SECOND ST. PROPERTY

69) On or about June 1, 2021, Plaintiff rented the Second St. Property to a group of college students.

70) The lease began on July 1, 2021.

71) The tenants, however, neither turned utilities on nor moved into the house for 7 weeks, presumably because they were attending Benedictine College and it was summer break.

72) When the tenants did show up on Saturday, August 20, 2021, they noticed that the house was humid and full of mold.

73) The tenants breached their lease and vacated the house the same day, *viz.*, Saturday, August 20, 2021.

74) On September 8, 2021, Defendant Wheeler contacted Plaintiff via email about the Second St. Property.

75) According to the email, Defendant Wheeler admitted to previously doing an inspection of the house, and

76) Defendant Wheeler condemned the house because it was "in a condition not suitable for habitation."[5]

77) Defendant Wheeler cited a list of violations, including "surface mold" and "piles of junk in basement and around exterior."

78) It is important to note that the tenants contacted Plaintiff on Saturday, August 21, 2021 and complained about mold.

79) That same day, the tenants breached their lease and vacated the property.

---

[5] This and all subsequent quotations from emails between parties can be substantiated.

80) Since the tenants showed up on a Saturday and vacated the house on the same day, the tenants had no authority to allow anyone into the house subsequent to their breach of contract and vacating the house.

81) Plaintiff presumes that the City code enforcement officers were not working on a weekend.

82) Therefore, sometimes between August 21, 2021 and September 8, 2021, when Defendant Wheeler emailed the Plaintiff, the City inspectors, without Plaintiff's permission and apparently without any warrant, entered into the Second St. Property and conducted an illegal search.[6]

83) Defendants argue that that City inspectors were requested to search the house by the former tenants.  (See ECF No. 17 at 26).

84) When the Defendants searched the house, it was vacant.

85) Therefore, even if the Defendants were requested to search the house by the previous tenants, the City inspectors had constructive knowledge that the tenants may not have had legal possession of the house or authority to allow the City inspectors to inspect the house.

86) The City inspectors had a duty to the owner of the house not to inspect it illegally.

87) As a City employee, Defendant Wheeler owed a duty of good faith to the Plaintiff.

88) He also had a duty to the Plaintiff to act according to the laws of the state, and in accordance with the Municipal Codes of the City of Atchison.

89) He also owed Plaintiff a duty to follow Federal Laws, the Constitution, the Bill of Rights, and other Amendments to the Constitution.

90) Specifically, he owed a duty to Plaintiff not to illegally search his house.

---

[6] It is Plaintiff's understanding that Defendant Wheeler's job with the city involves law enforcement aspects as well.

91) At the very least, based on the fact that the house was empty and that it was well past the starting of school, he had enough knowledge to be on warning that the tenants who requested the house may not have authority to allow him to inspect the house.

92) In short, he had a duty not to search the house without probable cause, or a warrant from a proper tribunal.

93) For the Fourteenth Amendment applies the basic protections from the Federal Government to States and their actors, including Municipalities and their employees.

94) Similarly, Municipalities owe a duty to Plaintiff and other citizens to hire, train, and supervise their employees, so that they are following state and municipal laws and codes.

95) However, the September 8, 2021 email from Defendant Wheeler listed such items as an "S-trap" under the bathroom sink, and a valve on the water heater, items which are physically impossible for anyone to see without entering the house and doing a search.

96) Therefore, even if Defendant had probable cause and / or a search warrant issued by a local tribunal or other competent authority, the basis of such probable cause would not have warranted the Defendant to search under the bathroom sink nor the gas line to the furnace.

97) In short, based on information and belief, Defendant Wheeler did not have any justifiable reason for entering into the property, such as an emergency, nor any probable cause to search all the areas that he did search.

98) Nor did the former tenants have any authority to allow Defendant Wheeler to search the property.

99) And because the house was empty, Defendant Wheeler should have had at least enough constructive knowledge to be on notice that he might not have proper authority to search the house.

100) Given that Defendant Wheeler knew full well that Plaintiff owned the house, he could easily have requested permission from Plaintiff or Plaintiff's manager to search the house.

101) Yet, Defendant Wheeler did not seek any permission from Plaintiff to search the house.

102) Nor did Defendant Wheeler have any other defense for the action of entering into the Second St. Property.

103) By conducting an illegal search on Plaintiff's property, Defendant Wheeler was acting *ultra vires*.

104) And if Defendant Burke was involved, then he too violated Plaintiff's basic rights.

105) For Defendant Burke too owed all of the above enumerated duties to the Plaintiff.

106) Moreover, the City condemned Plaintiff's Second St. Property and required Plaintiff to make a series of repairs to the property allegedly in violation of City Codes.

107) While two of those repairs were tied to plumbing issues, the remaining repairs required by the City officials had nothing to do with plumbing.

108) The City Codes, however, as Plaintiff will articulate in full in the later part of this Complaint, only allow the City to keep water off if the plumbing system is not up to Code.

109) Therefore, by tying water service to other repairs, the City officials were acting *ultra vires*.

110) In doing so, the City recklessly, if not intentionally, interfered with Plaintiff's contract with tenants.

111) Some of Defendant's actions, such as illegally entering into the house, were *ultra vires*.

112) To the extent that any of the Defendant's actions were not *ultra vires*, then the actions were the product of negligent hiring, training, and / or supervision.

113) Or the Defendants' actions were the product of illegal policies that deprive Plaintiff of basic property rights without notice or an opportunity to be heard.

114)    Furthermore, in a breach of contract lawsuit against the tenants, Defendant Wheeler was asked under oath about the citation for mold.[7]

115)    Astonishingly, Wheeler admitted under oath that there are no City or Municipal building Codes that deal with mold!

116)    So Defendant illegally entered and searched Plaintiff's property without Plaintiff's permission or a warrant, without justification or any emergency, condemned the property as "not suitable for habitation," required extensive repair work, and tortiously interfered with Plaintiff's contract based in part on a non-existent code.[8]

117)    In doing so, Defendant acted *ultra vires* and under color of local Ordinances and Codes.

118)    Due to the laundry list of "Code Violations," including violations of non-existent codes that the Defendant required Plaintiff to rectify, Plaintiff spent nearly two months and thousands of dollars to satisfy Defendant Wheeler before he would allow Plaintiff to lease the house again or to turn water service on to the Property.

119)    As to other possible defenses of the City's actions, Plaintiff incorporates the arguments made in ECF No. 24, at 10-11, and 16-17.

## **RILEY PROPERTY**

120)    Plaintiff incorporates paragraphs 66-181 of the Original Complaint documenting in part Plaintiff's efforts to get water turned on at the Riley Property.

---

[7] See *NewTown v. Hahn, et al.*, 2021 LM 270.  This suit was between the Plaintiff, d/b/a New Town Properties, LLC and former tenants of the Plaintiff.  As such, the Plaintiff was the real party in interest.  Moreover, the City sent the Plaintiff, not New Town Properties, LLC, a notice about the necessary repairs.
[8] During the same litigation, counsel did not ask what City or building code deals with "junk in the basement," but Plaintiff has been unable to locate any such code that would justify City's actions.

121)     What follows are largely additional information and clarifications to the factual allegations presented in the Original Complaint.[9]

122)     As indicated in the Original Complaint, on October 13, 2021, Wheeler contacted Plaintiff about the Riley Property.[10]

123)     As it turns out, the City had turned water off on September 21, 2021 due to non-payment.

124)     For the sake of clarification, Plaintiff does not object to the City's decision to turn the water off when the former tenant failed to pay his water bill or when he tampered with the water meter.

125)     On January 27, 2022, Wheeler contacted Plaintiff about the Property and indicated that it needed to be cleaned up and that it was "in a state of disrepair," and asked if there was a plan to deal with it.

126)     Plaintiff responded the same day that he had a plan in place and that the house would be cleaned up within a week or so, depending on the winter weather.

127)     On Feb. 11, 2022, Plaintiff, through his manager, Christian Ryan, informed Wheeler that the Riley Property had been cleaned up and that he would begin addressing any repairs that needed to be done to it.

128)     On or about March 28, 2022, Plaintiff requested the City to turn water on at the Riley Property.

---

[9] The biggest clarification and correction is that Plaintiff did instruct Austin Almond to pull a building permit on May 25, 2022, and by doing so, did give the Defendants permission to inspect the Property.
[10] ECF No. 67.

129)    On March 28, 2022, Plaintiff's manager Ryan reached out to Defendant Wheeler specifically, informing him that Plaintiff requested to have the water turned on to get the house cleaned up, and notifying him that the water meter was locked.[11]

130)    On March 29, 2022, Wheeler notified Ryan that the City was "generally hesitant to turn on water until we know that it meets the minimum standards for habitation."[12]

131)    Wheeler did not say, however, what constitutes "the minimum standards for habitation."

132)    In the same email, Wheeler mentioned that the house was "pretty tough [sic]."[13]

133)    How Defendant knew that the Riley Property did not "meet the minimum standards for habitation" is not clear.

134)    The Riley Property was vacant from November onwards.

135)    No tenant lived in the house, nor was anyone authorized to be in it.

136)    Nor is there any documentation that someone complained about or reported the house to the City.

137)    One possibility is that Defendant Wheeler's evaluation of the "habitability" of the house is unfounded and meritless.

138)    Stated differently, it is possible that Defendant Wheeler based his claim on no evidence whatsoever.

139)    If this possibility is true, then the inference would be that Defendant Wheeler is not doing his job properly.

---

[11] It was presumably locked due to the fact that the previous tenants had tampered with the meter and had an unpaid water bill.

[12] As Plaintiff will argue below, there appears to be no code that would allow the City to keep water off until it met the "minimum standards for habitation."

[13] Defendant presumes Wheeler meant that the house was "pretty rough."

140)   In which case, Defendant Wheeler was acting *ultra vires*, going well beyond what is required of him in his official capacity.

141)   For as a City Inspector, Defendant Wheeler owes a duty to Plaintiff to report accurately on the condition of the houses he inspects.

142)   So if Defendant Wheeler is making judgments on the habitability of the house without having seen the inside, then he is breaching a duty that he owes to the Plaintiff.

143)   Alternatively, it could be the case that Defendant Wheeler is basing his judgment on having actually been inside the house, and seeing things first hand.

144)   However, since Defendant Wheeler did not have any permission from the Plaintiff to be in the house prior to late May 25, 2022, then he would have gained entry illegally.

145)   Moreover, any fruit of any illegal entry would be fruit of the poisonous tree and should be excluded from any efforts the City makes to condemn the house.

146)   But again, all of the duties mentioned above with respect to the Second St. Property apply equally well to the Riley Property.

147)   That is, Defendant Wheeler had a duty to respect Plaintiff's property.

148)   He had a duty not to enter the property illegally without probable cause, or a search warrant.

149)   But there is no record that Defendant Wheeler had probable cause or a search warrant.

150)   Nor is there any indication that Defendant Wheeler had any other justifications or defenses for entering into the subject property.

151)   Unlike the situation with the Second St. Property, there were no tenants who had any sort of apparent authority to allow the Defendants into the Property.

152)     Of course, it is possible that both sides of the disjunction are true (which I will argue at

         length below is the case): that Defendant's judgment that the house is not fit for habitation was

         baseless and without any evidence in fact, and that he illegally entered the house.

153)     What is not possible, however, is for both sides of the disjunction to be false.

154)     On March 30, 2022, Plaintiff responded to Wheeler that he acknowledged that the house

         was "rough," and that Wheeler knew Plaintiff well enough to know that he strove "to provide

         quality rentals" in town.

155)     Plaintiff additionally gave his "word that it [the Subject Property] won't be rented before

         it is up to code and in good shape."

156)     Plaintiff assured Wheeler that once it was cleaned up and repairs were done, he could

         "inspect it before we rent it."

157)     Wheeler responded to Plaintiff's assurances on the same day, indicating that he would run

         things past Phil Burke and get back to Plaintiff.

158)     As Plaintiff discovered through a KORA request on June 12, 2023, Defendant Wheeler did

         in fact send Plaintiff's message to Defendant Burke on March 30, 2022.

159)     Defendant Burke had responded to Wheeler via email at 2:09 p.m. on March 30, 2022.

160)     The entirety of Defendant Burke's email to Wheeler reads as follows:

         > "Based on our current internal policy we wouldn't be able to do that. If the
         > remodel is extensive our office would expect to see a building permit issued
         > for the location. Cleaning would take place once this renovation is
         > completed, if in fact it is extensive. " [sic]
         >
         > His word doesn't mean much of anything to anybody. How about we inspect
         > now and then if no permit we inspect it once this renovation is completed
         > to see what you've [sic] done without a permit and inspections. No body
         > needs water to tear out shit and haul it to the dump. Joe Crack smoker needs
         > a place and you can stay here if you clean it up is most likely the deal.
         >
         > Fuck him.

161)   Whether or not Defendants Wheeler and Burke inspected the Property on March 30, 2022, as he indicated, is a fact issue to be determined at trial.

162)   Again, it should be pointed out that the house had been vacant since November of 2021.

163)   If the Defendants did inspect the house on or about March 30, 2022, they did so without permission.

164)   Because neither Plaintiff nor Plaintiff's manager gave the Defendants permission to inspect the house on that day.

165)   And the house had been vacant for at least four months at this point.

166)   If the Defendants did not inspect the house at that point in time, then their decision to withhold water was arbitrary, capricious, and malicious.

167)   Arguably, the email also defamed Plaintiff by saying that "his word doesn't mean much of anything to anybody."

168)   And that Plaintiff "is most likely" to have a "deal" with "Joe Crack smoker," implying that Plaintiff conspires with, and possibly involved in, illegal narcotics.

169)   In hind sight, given Burke's March 30, 2022 email to Wheeler, it is no surprise that the City denied Plaintiff water to his Riley Property.

170)   On May 25, 2022, Plaintiff hired Austin Almond to pull a building permit for the Riley Property.

171)   Apparently, Austin and the City Officials did inspect the house on May 25, 2022, with Plaintiff's permission.

172)   It had been raining previously, and water had seeped into the basement through some of the limestone basement wall.

173)   In spite of Plaintiff's efforts to pull a building permit and have water turned on, the City refused to issue a building permit and refused water service.

## 4th ST. PROPERTY

174)   It should be pointed out, by way of contrast, that in 2014, Plaintiff purchased a house located at 411 N 4th Street.

175)   The 4th St. Property was in serious need of repair:

a)   The roof leaked and had major problems.[14]

b)   Water leaking through the roof had penetrated through the second floor and destroyed most of the kitchen on the first floor.

c)   The entire brick veneer on an east wall and south wall had completely fallen off due to foundation issues.

d)   There were other serious foundation problems, including rotted floor joists, in one room due rotted wood.

176)   Yet, in spite of these far more serious problems, the City did not deny Plaintiff water service to the 4th St. House.

177)   Nor did the City require Plaintiff to hire a structural engineer.

## RILEY PROPERTY FILE

178)   Approximately a year later, on May 8, 2023, Plaintiff sent a KORA Request to the City, requesting the file on the Riley Property.

---

[14] Plaintiff not only had to remove multiple layers of shingles, but he had to re-deck the entire surface of the roof to make it structurally sound.

179)   On June 9, 2023, the City finally mailed Plaintiff a thumb drive of the file for the Riley Property, which he received on June 12, 2023.

180)   It was in the Riley File that Plaintiff first discovered the March 30, 2022 email from Burke to Wheeler.

181)   The file also contained a whopping total of 22 pictures of the Riley Property.

182)   Although Plaintiff requested that all pictures of the Property contain metadata showing when the pictures were taken, none of the 22 pictures show any such data. See Exhibits 1-22.

183)   Rather, all of the pictures show that they were created on June 9, 2023.

184)   Of the 22 pictures, 11 were taken from the street and show the exterior of the house (most from quite a distance).

185)   Of the remaining 11 pictures, one is a duplicate and one is so dark that it is pointless, leaving nine pictures of the basement.

186)   There were no pictures of the inside of the house at all.

187)   Of the remaining nine pictures, only four show some floor joists that were damaged by termites or rot.

188)   Based on the nine basement pictures, there is approximately 6 feet of damaged, rotted wood along the edge of the east wall, which had been fixed prior to the picture being taken.

189)   The two pictures of the east basement wall are also unremarkable.

190)   The pictures portray a typical limestone wall that is plumb.

191)   Nothing in the wall has crumbled or shifted.

192)   All of the stones are in place, but you can see some areas where moisture would get into the basement if there was a heavy rain.

193)   Based on an official governmental website, limestone is "extremely durable."[15]

194)   The same governmental website describes a number of potential problems, including the fact that limestone walls absorb water, and can "flake," which is when "small, think pieces of the outer layers of stone" detach from a larger piece of stone.[16]

195)    Admittedly, the basement wall, being made of limestone, did allow water penetration and there was some flaking that occurred.

196)   However, what is significant is that the east basement wall is entirely intact.

197)   It has not shifted any at all.

198)   Nor are there any stones missing from the wall.

199)   Nor are there any pictures at all of the remaining three basement walls.

200)   In short, other than four pictures showing a couple of damaged floor joists, the file is remarkable for its utter lack of evidence of a "severely dilapidated house."[17]


## PERMIT DENIAL

201)   The file also contained a Permit Denial based on the request from Austin Almond to pull a permit on May 25, 22.[18]

202)   The document is strange for a number of reasons.

203)   First, it shows under the Date that it was created on May 26, 2022 by Defendant Burke.

---

[15] https://www.gsa.gov/real-estate/historic-preservation/historic-preservation-policy-tools/preservation-tools-resources/technical-procedures/limestone-characteristics-uses-and-problem#:~:text=Limestone%20is%20extremely%20durable.,it%20can%20suffer%20substantial%20deterioration.

[16] *Id.*

[17] Resolution 3345 described the Property as "seriously dilapidated."

[18] See Ex. 23.

204)    However, on the bottom right hand corner of each page, there is a different date, that of November 30, 2022.

205)    November 30, 2022 was one day after Plaintiff notified the City that he would be filing this lawsuit.

206)    However, the metadata on the file shows that the file was created on June 9, 2023.

207)    Based on the three different dates, it is unclear exactly when the file was created.

208)    Furthermore, as Plaintiff has documented at length in his Original Complaint,[19] he had repeatedly asked the City for precise, detailed information of what exactly was wrong with the Riley Property.

209)    However, this one document, which Plaintiff finally received on June 12, 2023, contained the most detailed information to date about the condition of the Property.[20]

210)    Previous to receiving this Permit Denial, the most precise things that the City had said about the Property was that it had structural or foundation issues, termite damage, and plumbing issues.

211)    However, as Plaintiff has argued at length elsewhere, "To tell the Plaintiff that he must repair his Property, while at the same time only ever telling him in the most general and vaguest of terms that the house suffered from "plumbing problems, termite damage, and foundation problems" is worse than a police officer citing a motorist for "traffic violations," without ever saying which infractions the motorist breached."[21]

---

[19] ECF No. 1, Nos. 66-200.
[20] See Ex. 23.
[21] ECF No. 24, at 8, fn. 31.

212)   "No municipal court anywhere in the United States would impose even a modest $100 traffic fine on a motorist if all the officer said was that the motorist committed 'traffic violations,' without more."[22]

213)   "To impose even a modest fine, the prosecutor would have to prove 'every element' of the offense, and would have to cite the code violation."[23]

214)   The Kansas Supreme Court in *Harris* pointed out that a "statute that 'either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application' violates the Fourteenth Amendment to the United States Constitution and is thus void for vagueness."[24]

215)   "In the instant case, however, the City has withheld water for over a year now, and proceeded through issuing two Resolutions to demolish the house with only ever saying that Plaintiff's house was 'uninhabitable' because it had 'plumbing problems, some termite damage, and foundation issues,' the last of which we now know is false based on the structural engineer's report!"[25]

216)   Plaintiff will not recount here his numerous attempts from June-November of 2022 to get water turned on at the Riley Property, but will simply incorporate the narrative from the Original Complaint, paragraphs 66-181.

217)   He will, however, summarize the problem thus:  To this date, the City has never officially served notice, per any local codes or statutes, notifying Plaintiff as to why his property rights, specifically his right to water at the Riley Property, are being denied.

---

[22] *Id.*

[23] *Id.*

[24]  *State v. Harris*, 311 Kan. 816, 821, (2020) (*citing State v. Richardson*, 289 Kan. 118, 124, 209 P.3d 696 (2009)).

[25] *Id.*

218)   Nor has he had any opportunity to be heard by any official other than Defendants Burke

and Wheeler as to why his water was denied.

## KANSAS TORT CLAIM ACT NOTIFICATION

219)   Recognizing that some of Plaintiff's causes of action sound in tort, even if they are not

technically torts, Plaintiff thought it prudent to give notice to City under the Kansas Tort

Claims Act.

220)   So on November 29, 2022, Plaintiff sent an email to:

a)   Tina Fitzpatrick, the City clerk;

b)   Bob Campbell, the City attorney;

c)   Allen Reavis, a City Commissioner;

d)   Jesse Greenly, a City Commissioner; and

e)   Larry Wilcox, also a City Commissioner.

221)   In the email, Plaintiff requested that the City turn water on to the property.

222)   And if the City continued to refuse to turn water on, Plaintiff was thereby notifying the

City that he would be bringing a lawsuit in 120 days or thereafter.

## PLAINTIFF'S PERSONAL BACKGROUND

223)   In order to understand the facts surrounding the next allegation, it is necessary for Plaintiff

to recount a few things about his personal background.

224)   Prior to moving to Texas, Plaintiff used to work in Atchison from 2003-2014 as a

philosophy professor at Benedictine College.

24

225)    It was largely during his summer free time during that 11 year period of time that he purchased  and renovated most of the various rental properties that he now owns.

226)    However, in 2014, Plaintiff lost his faculty position at Benedictine College.

227)    Plaintiff was justly terminated for violating school policies.[26]

228)    Although Plaintiff fought the termination through two internal college hearings (one with fellow faculty and an appeal to the board) and an external *de novo* review by the American Arbitration Association, he never did regain his position.

229)    Throughout the process, though, he was very vocal about the termination and many people in the small community of Atchison knew about his termination, including a number of current employees and Commissioners for the City.

230)    Although Plaintiff subsequently taught for a year in Belgium, he wound up teaching at a couple of high schools in San Antonio for a few years before he decided to change careers in 2020 and attend law school.

231)    In December of 2022, after two and a half years, Plaintiff finished law school, graduating a semester early.

232)    However, on November 30, 2022, *the day after* he notified the City that he would be filing the present lawsuit, the Texas Board of Law Examiners (BLE) received an email from someone associated with Atchison, claiming that the Plaintiff lacked the ethical requirements to practice law in Texas.

---

[26] Plaintiff has no intention to rehash what occurred then.  Suffice it to say, he was justifiably terminated, and his termination was widely known.  However, in 2015, after losing his last chance to save his job, an arbitrator from the American Arbitration Association filed a 45 page decision in the matter, based on over a year of discovery and nearly a $100k spent by the College.  That decision was authored by Jerome A. Diekemper, and is No. 57-160-28-14.

233)   Although the Texas Board of Law Examiners know who sent the email, Plaintiff has not been informed about the person's identity.

234)   To this day, Plaintiff only knows that it was sent by someone who remains anonymous to him.[27]

235)   Plaintiff alleges that the email was sent to the Texas BLE to interfere with the instant lawsuit against the City.

236)   As the Court can see, the email is arguably quite innocuous in many ways.

237)   It does not allege that the Plaintiff committed any crimes.

238)   Rather, it says that nearly 10 years ago, Plaintiff "glared at" and "verbally abused" a barista at the only local coffee shop in Atchison, after he lost his position teaching philosophy.

239)   However, the email is extremely interesting for a number of reasons.

240)   First, the fact that it was sent to the Texas BLE the day after Plaintiff notified the City that he intended to bring this lawsuit is extremely coincidental and suspicious.

241)   If that coincidence were all there were to the email, Plaintiff would not be including it in this Amended Complaint.[28]

242)   However, the author of the email claims to have gone to Notre Dame Law School and then went on to clerk for a federal judge.

243)   In Plaintiff's experience, those students fortunate enough to clerk for a federal judge, as this Court would know all too well, are the cream of the crop.

---

[27] See Ex. 24 & 25.

[28] It was not until June 12, 2023, when Plaintiff received the March 30, 2022 email from Burke to Wheeler, with the "Fuck him" signature, that finally persuaded Plaintiff that there were some seriously malevolent actions within the City, such that he decided to include this episode in the Amended Complaint.  The other major incident was that sometime in the middle of May, Plaintiff found the video recording of the January 17, 2023 City Commissioner's meeting, in which the City Commissioners decided to proceed towards demolition, coupled with the patently absurd claims made by Wheeler and the absolute paucity of evidence used to support the decision, which Plaintiff will articulate below.

244)   And Notre Dame is by no means an inferior law school.

245)   And yet, this "anonymous" email is riddled with spelling mistakes and grammatical errors, which are not what one would expect from an attorney who attended Notre Dame Law School and clerked for a federal judge.

246)   Third, the email repeatedly refers to the Plaintiff by his full name, either Lloyd Newton or misspelling it Llyod Newton.

247)   However, in Plaintiff's entire 30 year academic career, past students never refer to a professor by his full name.

248)   Rather, Plaintiff was uniformly known to students as Dr. Newton.

249)   Even when Plaintiff would request a former student to call him by his first name, students would do so reluctantly and only after Plaintiff insisted multiple times.

250)   Yet this email to the BLE repeatedly refers to the Plaintiff by his given name, as if she knew Plaintiff on a personal level.

251)   Fourth, the anonymous email claims to have sat down as a potential witness in 2014 with the Plaintiff, Plaintiff's attorney, and the President of the College, but without any mention of the College's attorney.

252)   Plaintiff, however, distinctly remembers that fateful day, since it involved the termination of his academic career, and he never sat down with this witness.

253)   In fact, during that initial hearing before fellow faculty, Plaintiff was not even allowed to be in the same room or to confront the only witness who did speak against him.[29]

---

[29] Plaintiff had to listen to his one accuser through what was essentially a conference call.  Moreover, from what little Plaintiff knows about a civil case, even one not constrained by all the rules of civil procedure, no lawyer or relaxed rule of procedure that may have existed in the case would ever allow the Plaintiff in that situation to sit down with a potential witness before a trial.

254)   While there are several other anomalies about the email, it had the effect of delaying Plaintiff's law career.

255)   A few months later, Plaintiff did take and pass the February bar exam in 2023, but because of this email, he has to have a hearing before the Texas BLE before the Board will grant him a license to practice law.

256)   As of May 31, 2023, the BLE has finally scheduled a hearing for November 16, 2023 to determine whether Plaintiff has the ethical qualities necessary to practice law in Texas.

257)   Other than his termination from BC ten years ago, Plaintiff has no other marks against his character whatsoever.

258)   And the email doesn't even say that Plaintiff did anything unethical.

259)   However, it was enough that the Texas BLE decided to conduct a future hearing to determine Plaintiff's character to practice law.

260)   Although ever since he heard about the email in January 2023 Plaintiff has suspected that the email delaying his ability to practice law in Texas may be connected with this lawsuit, he did not include it the Original Complaint because he did not have enough evidence that the email was connected to the present lawsuit.

261)   However, since receiving a copy of the email, Plaintiff has spoken with three different law enforcement officials, and all three agreed that the email was suspicious.

262)   As plaintiff sees it, either a former student from Benedictine College, whom Plaintiff did not even have in a class, coincidentally sent a defamatory email to the BLE on the very day after Plaintiff notified the City that he would be filing this lawsuit, or someone with ties to the City orchestrated, or worse, possibly fabricated, the email in an effort to detract Plaintiff from this lawsuit.

263)   If the timing of the email were the only thing suspicious about the email, Plaintiff would not have included it in the Complaint.

264)   However, given (1) the grammatical and typographical errors, (2) the fact that the person called Plaintiff by his first name, and (3) the mentioning of a meeting that didn't occur, Plaintiff is left with the more likely inference that someone within the City fabricated or procured the email.

265)   Granted, Plaintiff realizes that at this point he cannot prove his theory, which is one of the reasons he is eager to conduct discovery.

266)   And while Plaintiff reluctantly recounts these facts, he does so because the possibility that the email is connected to this lawsuit is more likely than the purely coincidental chance that a former student from the college would send an email riddled with grammar mistakes on the very day after he informed a number of officials with the City that he intended to initiate this lawsuit.

267)   Evidence that the second scenario is more plausible includes the fact that three of the City Commissioners have close ties to the College and all three of them would have known of Plaintiff's termination 10 years ago.[30]

268)   Moreover, both Defendant Wheeler and local counsel Bob Campbell would also have known of Plaintiff's termination.

269)   Granted, Plaintiff's allegations here are inferences, but they are inferences that he reluctantly drew and are allegations that he does not make lightly.

---

[30] Commissioner Wilcox was the former head football coach of Benedictine; Lisa Moody is the wife of the basketball coach; and Abby Bartlett was the secretary to the President of Benedictine College. Additionally, when Plaintiff taught at BC years ago, he was an extremely difficult professor who taught required courses, and a number of athletes would avoid his classes.

270)    If Plaintiff is correct, then the actions of someone are not mere *ultra vires*, but cross the line into criminal actions.

271)    Consequently, one of the causes of action that Plaintiff will allege includes RICO violations.

272)    To show why this is plausible, Plaintiff needs to describe in more detail the location of the Riley Property and the strategic importance of it.

## LOCATION OF RILEY PROPERTY

273)    Atchison is a small town of approximately 10k residents.

274)    A quick look on Google Maps will show that it consists of about 30 blocks along its north south axis, and about 20 blocks along its east west axis.

275)    Benedictine College (BC) consists of approximately 2k students, and is located on the far northeastern section of the City.

276)    To say that BC dominates the City and has a major influence on the City is an understatement.

277)    BC is in the process of adding a medical school, and is in need of additional space to house the new school.

278)    However, BC is severely landlocked.

279)    On its east side, it sits high on a bluff overlooking the Missouri River.

280)    In spite of the bluff, it has pushed the boundaries as far as possible to the east.

281)    To the north are a number of large athletic fields, coupled with the monastery that owns the College.

282)    The College could, feasibly, continue to spread north, but doing so is impractical.

283)   To the west are high end houses.

284)   Yet, even in spite of the high end properties to the west, over the past 20 years, BC has purchased a number of houses to the west, now owning property all the way over to Third or Fourth Street.[31]

285)   However, to the south of the college, there are six rectangular blocks of property that is essentially prime for the taking.[32]

286)   This six block section consists of three north south blocks of property, beginning at Laramie on the southernmost edge, then going through Kearney, then Riley, and finally terminating at Mound, which abuts up to the College.[33]

287)   Going from west to east, the property consists of the back side of Second St., a washed out First St. that the City intends to rebuild, and Washington street.

288)   Much of this area consists of a low valley, whose houses were probably washed out by floods in the 1950s or thereabouts.

289)   However, the western side of Washington from Laramie to the south to Riley on the north consisted of a seriously blighted strip of 8 houses.[34]

290)   Most of the property to the west of Washington, where the City intends to build 45 new houses with the $10 million housing grant which it recently acquired, is currently owned

---

[31] When Plaintiff moved to Atchison in 2003, the College did not own anything at all on the west side of Second Street, nor anything south of Mound.

[32] Plaintiff referred to some of this property in his Original Complaint.  See ECF No. 1, at 245-262, which Plaintiff hereby incorporates.

[33] See exhibits 26 & 27, which are two maps of the area, one showing BC's footprint, and another showing the six blocks south of the college.

[34] The street view of Google Maps does a good job of capturing these 8 houses and the shape that they were in.

primarily by 3-4 individuals: a former City Commissioner, a local lawyer, a BC alumna, and an LLC named Vision 4 First.[35]

291)   Vision 4 First LLC also recently purchased 208 Riley, the only other property on Riley, besides the Plaintiff's Property at 200 E. Riley, to the east of Washington and overlooking the bluff.

292)   That puts Plaintiff's Riley property right in the middle, between a major redevelopment to the west of Washington street and the only other property to the east, which is now owned by the same development LLC that owns a significant portion of the property to the west of Washington.

293)   So to say that Plaintiff's Riley Property is a highly valuable piece of property in a rapidly developing area of Atchison is an understatement.

294)   The same LLC did offer to buy Plaintiff's Riley Property in 2020, but at the time was not willing to pay much for it, and even admitted at the time that if they bought it, they would immediately tear it down to build something else.[36]

295)   Consequently, to suggest that the City has ulterior motives in withholding water service to the Riley Property, ultimately with the intent to obtain the Property through eminent domain, and to sell it to a developer or to BC is highly plausible.

**EMINENT DOMAIN AND**

**THE JANUARY 17, 2023 COMMISSIONER'S MEETING**

---

[35] For the $10 million grant, see ECF No. 1, at 172-181.
[36] See ECF No. 1, at 178, which Plaintiff hereby incorporates.

296)    In 2005, the U.S. Supreme Court issued one of its most controversial eminent domain cases when the City of New London, Connecticut ultimately used eminent domain to benefit the private entity Pfizer.[37]

297)    In response, the State of Kansas passed K.S.A. 26-501, limiting the ability of municipalities to take private property through eminent domain.

298)    That statute states: "On and after July 1, 2007, the taking of private property by eminent domain for the purpose of selling, leasing, or otherwise transferring such property to any private entity is authorized if the taking is: (e) by any municipality for the purpose of acquiring property which is *unsafe* for occupation by humans under the building codes of the jurisdiction where the structure is situated."[38]

299)    Over time, Plaintiff slowly came to realize that the real goal motivating the Defendants was not health and safety, as the Defendants claim,[39] but ultimately to acquire Plaintiff's Riley Property.

300)    No other explanation makes any sense.

301)    First, if Defendants were indeed worried about the safety of the Property, they would have given Plaintiff detailed info about what was wrong with it, and what he needed to do to repair it.

302)    Second, the Defendants would have provided water to the Property, so that Plaintiff could mix stucco to repair the cracked stucco on the south and east side.

303)    Beginning with Defendants March 30, 2022 email, where Burke arbitrarily decided to refuse water, then the City's refusal to allow Austin to pull a building permit, the repeated

---

[37] *Kelo v. City of New London, Conn.*, 125 S.Ct. 2655, (2005)
[38] K.S.A. 26-501b. (emphasis added).
[39] ECF No. 17, at 1, 19.

refusal to identify any Code violations or to specify any precise thing that needed repaired, all finally began to make sense, once the City Commissioners convened on January 17, 2023.

304)   For instead of working with Plaintiff to get the Riley Property up to Code, if it ever actually wasn't up to Code, the City responded to Plaintiff's November 29, 2022 notice of his intent to file this lawsuit by doubling down and proceeding toward demolition with the goal of ultimately taking Plaintiff's property through eminent domain.[40]

305)   As Plaintiff will articulate below, the City responded to Plaintiff's November 29, 2022 notice of his intent to sue by retaliating and deciding to issue Resolution 3333.[41]

306)   Unbeknownst to the Plaintiff at the time, the City Commissioners voted unanimously at its regularly scheduled January 17, 2023 meeting to proceed towards demolition of Plaintiff's Riley Property.[42]

307)   Plaintiff was apprised of the vote when he received his first official notice from the City, informing him of Resolution 3333, which set a "Show Cause" hearing for March 6, 2023.[43]

308)   Sometime in May of 2023, however, Plaintiff tracked down a video recording of the City Commissioners' meeting that occurred on January 17, 2023.[44]

---

[40] If the City had succeeded in its rush to tear the house down, it would have been impossible for Plaintiff to prove, in an inverse condemnation proceeding, that the house was "safe."

[41] For a detailed discussion of Resolution 3333, see ECF No 8, which Plaintiff hereby incorporates in its entirety.

[42] Plaintiff interprets all five of the Resolutions passed on that January 17, 2023 day, setting "Show Cause" hearings for March, 6, 2023, as having the goal of tearing the properties down.  If the goal, as the Defendants claim, really were to work with the Plaintiff, or other owners, then the City would have provided specific information on what needed to be repaired, and would have allowed water on so that Plaintiff could mix mortar to repair the cracked stucco, etc.

[43] See ECF No. 1, at 182-208, which Plaintiff hereby incorporates.  The notice which Plaintiff received was sent via certified mail, and was the first official notice of any sort that he ever received from the City about the Riley Property.

[44] The video was located at https://www.facebook.com/CityofAtchison/videos/614644713689375. Resolution 3333 was discussed and approved approximately during minutes 16-22.  Plaintiff requested a copy of the video recording through a KORA Request, but was denied a copy due to the pending litigation.

309)   It was during the Commissioner's meeting on January 17, 2023 that Defendant Wheeler first presented his flimsy case for the "Show Cause" hearing scheduled for March 6, 2023.

310)   One might think that the City would make absolutely sure that it had enough evidence before proceeding towards demolition.  But no!

311)   As Plaintiff previously mentioned, on May 8, 2023, he submitted a request through KORA asking for the entire file for the Riley Property.

312)   What he received were 22 unremarkable pictures and a handful of emails about the Property.

313)   That was it.

314)   So either the City has an extensive file on the Riley Property, showing that it is "seriously dilapidated,"[45] but which information was not sent to Plaintiff in response to his KORA request for the entire file, or there is an amazing paucity in the file to justify a "Show Cause" hearing and eventual demolition of the Riley Property.

315)   It is the latter alternative that makes more sense.

316)   During that presentation, Wheeler showed a couple of pictures of the exterior of the house, where there was cracked stucco.[46]

317)   Wheeler said then that "it" was pushing on the east side and cracking on the west side, though it is not clear what the "it" was.[47]

---

[45] Resolution 3345, issued on March 17, 2023, claims that the Property is "seriously dilapidated."

[46] Cracked stucco is not, in and of itself, an indication of serious foundation problems, since stucco in this instance is an exterior covering of the house and is not a structural component.

[47] See the video recording for the full presentation.  Admittedly, there some cracks in the stucco, which Plaintiff had already repaired sometime between when the pictures were taken and the January 17, 2023 meeting.

318)   Presumably, the "it" is ground water that runs into the house from the east yard, which slopes toward the house, coupled with the freezing and thawing of the water during the winter months.[48]

319)   Defendant Wheeler then showed one of the two basement pictures of the east side basement wall, and said: "here's the eastside foundation. I mean, it kind of looks intact at that picture, but you can walk up to it and literally just flick out stone."[49]

320)   He then adds that "it [presumably the east basement foundation wall] had taken on so much water and freeze thaw cycles, um, have been tough on it."[50]

321)   Then he shows the one picture of the furnace, and concludes that "the foundation is the major concern that we have on this house."

322)   Defendant Wheeler then proceeds to say that "the repair cost [would be] $33,550, and the home is valued at $11,690."

323)   It's not clear, however, where Wheeler got either of these two numbers.

324)   There is one City Code, however, that explains the two numbers:  section 37-10(a)(1).[51]

325)   Section 37-10(a)(1) states that "If the repair, alteration or improvement of said dwelling can be made at a cost of less than two hundred percent (200%) of the assessed value of the dwelling the order shall require the owner, within the time specified therein by the public

---

[48] See ECF No. 9, at 3-6 for the reasons why Defendant Wheeler's argument that the freezing and thawing of the ground water were so forceful as to push an entire house off its foundation are preposterous and violate the fundamental laws of physics.   Plaintiff incorporates all of ECF No. 9 along with its exhibits.

[49] https://www.facebook.com/CityofAtchison/videos/614644713689375, around the 17 minute mark.

[50] Id. Throughout his presentation, Wheeler looked strained and uneasy in his efforts to justify what he was asking the Commissioners to do.  Given Plaintiff's past friendship with Wheeler going back well over a decade, Plaintiff suspects that Wheeler is caught in the middle and does not want to be recommending that the house be demolished.  The fact that he seemed uneasy during that January 17, 2023 meeting, is evidenced by the incomplete sentences and incoherent arguments he was making.

[51] ATCHISON, KS. MUNICIPAL CODE, Ch. 37, § 37-10(a)(1)

officer, to repair, alter or improve such dwelling so as to render it fit for human habitation or to vacate and close the dwelling as a human habitation."

326)    The serious problem, however, is that there is nothing in the Riley Property File that shows where Defendant Wheeler obtained his two numbers.

327)    For starters, the County has the Riley Property appraised at $14,470, not $11,690 as Wheeler maintained during the presentation.

328)    Granted, there may not be much of a difference between a house appraised at $14,470 and one appraised at $11,690.

329)    The problem is that there is absolutely no documentation anywhere in the Riley File that reflects that number.

330)    Secondly, that number is not in keeping with the definition of "value" provided by the Code, which is defined in § 37-3(ww), of the Code of Ordinances as "the estimated cost to replace the building, in kind."[52]

331)    But there is no way that the entire house can be replaced for $11,690.

332)    Third, and more disconcerting still, is the second number, the $33,550 figure that Wheeler quoted that it would cost to repair the property.

333)    For starters, the City did not have Plaintiff's permission to have a construction company or any other contractor look at the Property and give a bid as to foundation work.

334)    So if there is a bid somewhere, it was done illegally.

335)    But Plaintiff is not alleging that the City illegally searched the Property when it acquired a bid for repair work, because there is absolutely nothing in the file showing any sort of bid.

---

[52] ATCHISON, KS. MUNICIPAL CODE, Ch. 37, § 37-3(ww).  See ECF No. 9 at 6.

336)   Moreover, no construction company anywhere is going to submit a bid to repair the foundation of a house, sight unseen.

337)   So since there is absolutely nothing in the file showing where Defendant obtained that number, either the entire file wasn't sent to Plaintiff, in violation of the KORA request for the entire file, or Defendant Wheeler was making up the number, or it's an unreliable and arbitrary number based on some software program.[53]

338)   Plaintiff sees no other explanation for this number.

339)   In short, there was an amazing lack of evidence in Defendant Wheeler's presentation or evidence to persuade the Commissioners to approve Resolution 3333.

340)   Yet, the City Commissioners rushed forward unanimously to approve Resolution 3333.

341)   Granted, Commissioner Wilcox did ask if Plaintiff had made any repairs on the house in all of 2022.[54]

342)   Although Defendant Wheeler said that Plaintiff had not done any repairs, this is not entirely true.

343)   In March of 2022, Plaintiff's manager did repair the floor joists that had suffered termite damage.

344)   In addition, Plaintiff did have the cracked stucco on the west side basement wall repaired during the summer of 2022, subsequent to when the pictures were taken but before the January 17, 2023 meeting, which Defendant Wheeler did not mention.

345)   However, the problem was not Plaintiff's unwillingness to work on the house.

---

[53] While discussing Resolution 3334 (discussed below), in which the City proceeds towards demolishing 717 S. Street, Defendant Wheeler mentions the price of repairing a house, but his source is the "online demolition analysis, Housing Demo Pro." How a website or program designed to estimate demolition of a house can accurately describe the price to repair the house, however, is never explained. Plaintiff could not find any software or website that

[54] https://www.facebook.com/CityofAtchison/videos/614644713689375, at approximately 19:30.

346)   It was that Plaintiff could never get a straight answer as to what needed to be done, nor could he get water necessary to mix stucco.

347)   Because Plaintiff had not physically been inside the basement of the Riley Property since 2015, he did not himself have recent, firsthand knowledge of the house or its condition.

348)   And because Plaintiff previously had a good relationship with Defendant Wheeler going back at least to 2008, Plaintiff naively trusted Defendant Wheeler when he said that the house had structural issues.[55]

349)   However, when Plaintiff asked his manager, other landlords, and building contractors to take a look at the house, they all unanimously said that the house was fine and they couldn't tell what needed to be done to the house.[56]

350)   Consequently, Plaintiff found himself quite perplexed about the structural integrity of the house.

351)   On the one hand, Defendant Wheeler and Burke said that the house had foundation problems, termite damage, and plumbing problems, even though they never could say more about exactly what needed to be done.

352)   Given that Defendants Wheeler and Burke are City inspectors, tasked with making sure houses are safe, Plaintiff initially deferred to their opinions.

---

[55] Keep in mind, at this point, Plaintiff was unaware of Defendant Burke's March 30, 2022 email where he arbitrarily and capriciously decided to deny water to the Property.

[56] The people Plaintiff asked included Dave Hausmann, a former City Commissioner, general handyman, and landlord who owns 35+ properties; Dave Deware, a landlord who owns over 200 rental properties in the City; Mike Slattery, another local landlord who owns a number of properties in the City; and Duane Denton, a highly skilled mason who completely dug out a basement on the side of a hill and installed all new basement walls, while his house was unmoved and untouched on top during the whole process.  It should be noted that the City never once required Denton to hire a structural engineer nor deprived him of water, even though the City had attempted for nearly 8 years to demolish his house.

353)   When pressed, Defendant Wheeler would simply fall back on the fact that he wasn't a structural engineer, so he couldn't say exactly what was wrong.

354)   Nor for nearly a year would either Wheeler or Burke provide any specific code violations or any code that allowed the City to keep water off at the property.

355)   On the other hand, Plaintiff had no fewer than three, highly trusted fellow landlords and one skilled mason, all of whom said that they didn't see anything significantly wrong with the house.

356)   Keep in mind, these are people who have spent more than 25 years each working on and maintaining rental properties in Atchison.

357)   Granted, these fellow landlords may not have degrees in structural engineering, but they have been maintaining, restoring, and providing houses in the community for over a quarter of a century.

358)   So when these other four individuals said that they couldn't see any serious problems with the house, Plaintiff found himself in a difficult situation as to how to proceed.

359)   Understandably, Plaintiff was unwilling and unable to hire contractors to repair a property when he couldn't tell them exactly what was wrong or needed repairing.

360)   Plaintiff did have a local plumber look at the plumbing system, and since he too couldn't exactly tell what was wrong, he was willing to rip out the entire plumbing system and replace it with new plumbing for $6k.

361)   However, since the City never said exactly what plumbing problems existed, Plaintiff declined to spend $6k to have all new plumbing, especially when the City never said that the plumbing was the main issue.

362)   As Plaintiff related in his Original Complaint, he did eventually hire a structural engineer, who said that his only concern was the need to regrade the east yard to prevent water from getting into the basement.[57]

363)   Bear in mind, if Plaintiff's reading of the City Codes is correct, the only reason why the City can keep water off is if the plumbing system is not up to code.[58]

364)   There is, however, another serious problem with the January 17, 2023 Commissioner's meeting.

365)   As previously mentioned, during the meeting, Commissioner Wilcox asked about the condition of the house and Wheeler responded that Plaintiff had requested water multiple times.

366)   To which, Commissioner Wilcox stated that Plaintiff's motive for having the water turned on was to rent the Property.

367)   Therefore, it was clear to the entire Commission that by keeping water off, they were preventing Plaintiff from renting it and thereby denying Plaintiff any ability to make money on his Property.

368)   The result of this decision was essentially a regulatory taking.[59]

369)   Commissioner Wilcox then relates that he did in fact receive the email that Plaintiff sent to the City on November 29, 2022.

370)   Moreover, during this entire meeting, local counsel Bob Campbell sat quietly by without saying a word.[60]

---

[57] See ECF No. 1, at 10, 206-208.
[58] See ECF No. 1, at 280-292, which Plaintiff hereby incorporates.
[59] *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992).
[60] Given that Plaintiff had hired Andrew Werring, a local attorney back in June of 2022 to try to get water service on, coupled with the Kansas Supreme Court case in *Dedeke* and Plaintiff's repeated request for Ordinances and Codes that allowed the City to deprive Plaintiff of water, the City had more than enough

371)   Defendant Wheeler then ended his presentation by saying that "when you drive by it, visually, it just doesn't strike you as some of the other's, but, yeah, it's kickin in and it's going to as time goes on, there's going to be some major problems with this place and we just don't want to allow another issue to continue."[61]

372)   Based on this flimsy evidence, the City Commissioners voted unanimously to pass Resolution 3333, requiring a "Show Cause" hearing in March 2023, as to why the house should not be demolished.

## RESOLUTION 3331
## 1016 KANSAS AVE.

373)   By way of contrast, before and after the Commissioners voted on Resolution 3333, regarding the Riley Property, they voted on 4 other Resolutions.  Looking briefly at these other four Resolutions is particularly enlightening as it shows a stark contrast between the other four blighted properties that the City Commissioners voted to condemn, and the Riley Property, as well as the unequal treatment between them.[62]

374)   The first property was located at 1016 Kansas Ave. and involved Resolution 3331.

375)   Defendant Wheeler began by showing a picture of a house that had recently been in a serious fire.

376)   Wheeler then went on to say that he "had not had any contact with the owner."

---

constructive notice of Plaintiff's constitutional right to water and the necessity of, at a minimum, giving him notice and an opportunity to be heard.  None of which it did.

[61] https://www.facebook.com/CityofAtchison/videos/614644713689375, at approximate the 21 minute mark.

[62] *Id.*  All of the following discussions of Resolution 331-3335 can be viewed on the video, and Plaintiff's quotations are taken verbatim from the video.  Since all of the subsequent quotations are from the same source, Plaintiff will not cite the following quotations.

377)   Prior to the fire, Defendant Wheeler said he spoke to the owner back in October of 2022, and even then, the owner indicated that the cost of rehabbing the house "was more than she could handle."

378)   Given that the house had sustained serious damage by a fire, and that the owner had not spoken with the City officials, the Commissioners voted to move towards demolition and passed Resolution 3331.

## RESOLUTION 3332
## 1036 LARAMIE

379)   Defendant Wheeler then moved to Resolution 3332, which dealt with a property located at 1036 Laramie.

380)   When Defendant Wheeler began discussing 1036 Laramie, he immediately admitted that the owner had been attempting to "get this thing repaired" for years.

381)   Defendant Wheeler then said that the water had been off for over a year because "there was a serious leak inside" and that the owner "knew that he wasn't going to be able to fix it."

382)   On one of the slides Defendant Wheeler showed, it indicated that the last time he spoke with the owner was April 14, 2022, and the owner "asked for cost share information."[63]

383)   When Commissioner Wilcox asked if the owner made any attempt to reschedule his missed appointment, Defendant Wheeler said "no."

384)   Understandably, again, since Defendant Wheeler had no contact with the owner, the City Commissioners voted to pass Resolution 3332.

## RESOLUTION 3334

---

[63] It is not entirely clear what Defendant Wheeler meant by "cost share," but based on Plaintiff's previous conversations with Defendant Wheeler, the "cost share" is an agreement with the City to share in the cost to demolish a building if the owner will donate the land to the City.

**717 S ST. PROPERTY**

385) Similarly, after the Commissioners voted to proceed towards demolishing the Riley Property, they moved to Resolution 3334, which dealt with 717 S St.

386) According to Defendant Wheeler, "the floors [of this house] are wavy, the foundation, contractors wouldn't even go down in the basement because of the condition of it."

387) Wheeler then said that "he had been inside it a few years ago and it was in really bad shape then."

388) Wheeler then shows a picture of the house, where it appears that the end to the left of the picture has sunk in the ground a few inches, and the other end to the right also has sunk into the ground, with a good 5-7" (or more) in the middle being higher than both ends, indicating clear foundation problems.

389) At that point, Wheeler shows a slide that indicates the price of repairing the house, but his source is the "online demolition analysis, Housing Demo Pro."[64]

390) How a website or program designed to estimate demolition of a house can accurately describe the price to repair the house, however, is never explained.

391) The same slide indicates that the house has been without water since August, 27, 2019.

392) Although Wheeler didn't present much more evidence that 717 S St. needed to be torn down, the fact that the City gave its owner over three years and four months to work on it raises issues as equal protection.

393) Again, it is curious why the City waited over 40 months before proceeding towards demolition of this house, when the City waited less than a year on the Riley Property.

---

[64] *Id.*, at 28 minute mark.

394)     A second major difference between the efforts to demolish 717 S. St. and the Riley Property

is that Defendant Wheeler asserted that there had been no contact for years with the owner,

whereas he admitted that the Plaintiff in the instant case had been in continual contact about

his desire to repair the Riley Property.

395)     The City voted to approve Resolution 3334.


**RESOLUTION 3335
723 WASHINGTON ST. PROPERTY**

396)     Finally, the City moved to consider Resolution 3335, which dealt with a property located

at 723 Washington, which also had recently suffered a fire.

397)     One of the pictures of the house shows a gable completely destroyed by fire, along with a

good portion of the roof missing due to the fire.

398)     Based on the one picture alone, one can tell that roughly 50% or more of the structure was

severely damaged by the fire.

399)     Then a second picture, from a different angle, shows that the entire interior of the attic had

been damaged by the fire.

400)     Curiously, however, Defendant Wheeler said that the cost of materials alone would be more

than $15k, even "if the owners did the work themselves."

401)     How or why Defendant Wheeler was willing to let the owners restore a house themselves,

without requiring a structural engineer, is also problematic.[65]

---

[65] Indeed, during the discussion of Plaintiff's Riley Property, Commissioner Greely asked if Plaintiff
was the type of person who would do his own work.  A curious question, given that Plaintiff lives in
Texas.  However, Defendant Wheeler responded that they would not let the Plaintiff do his own work
before he hired a structural engineer.

402)   Understandably, given that a fire had destroyed over 50% of the structure, which did not have insurance, the City Commissioners voted to approve Resolution 3335.

## COMPARISON OF THE 5 RESOLUTIONS

403)   When one looks at the five different Resolutions voted in favor of on January 17, 2023, one notices a stark contrast between the way the City dealt with Plaintiff's Property and the other four.

404)   To start, two of the other four had suffered fires, and sustained serious damage.

405)   The owners of the other two had not been in contact with the City, or had expressed interest in having the house torn down.

406)   In one case, the City waited over 3 years before putting it on the demolition list.[66]

407)   In not one of the cases, however, did the City require the owner to hire a structural engineer, even with regard to the property located at 725 Washington, where the pictures show that over 50% of the house had suffered damage from a fire.[67]

408)   Nor did any of the owners of the other four hire local counsel in an attempt to get the City to turn water on.[68]

409)   Consequently, Plaintiff is forced to draw the only logical conclusion:  the City is abusing its power in an effort to condemn Plaintiff's Riley Property and eventually acquire the Property through eminent domain.

---

[66] See fn. 67 below, where the City waited a whopping 17 years!

[67] Plaintiff has asked other landlords and contractors, and none of them have ever had to hire a structural engineer before the City would turn water on to a property.

[68] While doing research on this topic, Plaintiff came across Resolution 3297, regarding a "Show Cause" hearing for 813 Unity St., which occurred on May 2, 2022.  Based on a news article at the time, water had been off at the property for nearly 17 years, since October, 26, 2005.
https://www.atchisonglobenow.com/news/commissioners-get-update-on-demolition-request/article_5593a0ec-cbe3-11ec-a30f-ffefa25d1579.html

## MARCH 7, 2023 "SHOW CAUSE" HEARING
## RESOLUTION 3333

410)    As previously mentioned, Plaintiff finally received his first official notice on January 18, 2023, notifying him of Resolution 3333, which was a "Show Cause" hearing as to why the City should not tear the Subject Property down.

411)    The hearing was scheduled for Monday, March 6, 2023, at 4:30.[69]

412)    As discussed at length in the Original Complaint,[70] the hearing violated City codes § 37-10, which require that any "show cause" hearing be held during a twenty day window "not less than ten (10) days nor more than thirty (30) days after the serving of said notice."

413)    Because Plaintiff could not physically be present at the hearing, nor was there any opportunity for him to be present via zoom, Plaintiff hired Andrew Werring to attend the hearing on his behalf.

414)    After briefly introducing Resolution 3333, Defendant Wheeler shows a slide with a picture of the front of the house.

415)    At the bottom, there are the numbers previously mentioned: one for the estimated value of the house and another for the repair of it.[71]

416)    There is no mention where the estimated value of the house came from, which does not match the County appraised value.

---

[69] A video of the meeting is located at:
https://www.facebook.com/CityofAtchison/videos/778159923673612.  The Commissioners discussed Plaintiff's Property beginning at 6:30.
[70] ECF No. 1, nn. 279-356, which Plaintiff hereby incorporates.
[71] See supra, nn. 319-330.

417)     The estimated repair cost of $33,550 is based on the "online demolition analysis tool, Housing Demo Pro."

418)     Again, how a website or software devoted to projected costs of *demolishing* a house can provide an accurate bid as to what the cost would be to *repair* the house is anyone's guess.

419)     After Wheeler's brief introduction, Plaintiff's former Attorney, Andrew Werring, requested that the Resolution be tabled until the City provided *specific* information as to what was needed to repair the Property.

420)     Then Mr. Werring explained in detail that he had met with the City Officials back in May, 2022, at which point they were supposed to provide Mr. Werring and the Plaintiff a detailed list of specific repairs that needed to be done, but which he never received.

421)     Mr. Werring then explained to the entire group of Commissioners that the requirement to hire a structural engineer was too vague and broad as to be meaningless.

422)     Then Commissioner Wilcox asks why the Plaintiff hasn't made any repairs.

423)     To which, Mr. Werring replied that the Plaintiff did not know what repairs were needed to be made.

424)     At that point, Commissioner Wilcox said that "he knows that that place needs a hell of a lot of work."

425)     Since Commissioner Wilcox is not a City Inspector, and has not been authorized by the owner to inspect any portion of the house, one has to wonder what he means.

426)     At the most, Commissioner Wilcox was allowed, as any other citizen, to walk up to the property, on its curtilage and look at it from the outside.

427)     However, other than a few cracks in the stucco, which had since then been repaired, it is unclear how he knows that the house needs a "hell of a lot of work."

428)    Did Commissioner Wilcox illegally search the house?

429)    Commissioner Wilcox testified that his "wife doesn't even allow him to pick up a hammer," so one wonders what qualifications he has to determine, on his own, whether a house is safe or not.

430)    Then Commissioner Bartlett repeated that the house was unsafe, and that the City was justified in keeping water off so as to prevent Plaintiff from renting it out.

431)    At which point, Mr. Werring explained again that forcing the Plaintiff to hire a structural engineer was not the appropriate path forward, and that it was not the "correct process in light of the City's own Code of Ordinances."

432)    Mr. Werring then explained at length that simply telling Plaintiff that his Property was "unsafe" was too vague to be helpful, and that it was the City's responsibility to tell the owner, with specificity, what needed to be done.

433)    In response to Mr. Werring's request for information, Defendant Wheeler recited the same absurd claim that the water on the east side, coupled with the freezing and thawing that occurs during winters, had deteriorated the basement wall, and that one could reach in and pull out stones.

434)    Defendant Wheeler then claims that the excess water pressure has caused a shift in the entire house, contrary to the laws of physics and without any evidence that any of the walls are out of plumb.[72]

---

[72] As elaborated in ECF. No 8, the expansion that results from ground surface water freezing takes the path of least resistance, and moves upwards, towards the air, which provides less resistance than a 6" stone wall.  If, however, contrary to the laws of physics, the expansion of the frozen water were to push the house over, as Defendant Wheeler absurdly alleges here, a simple level would show that the basement wall is out of plumb.  Moreover, the wall opposite the top of the opposing soil would be pushed the farthest, since the surface would freeze more often, and since lower ground water would freeze less often, up to the point of the frost line, below which it does not freeze, there would be an arch in the basement

435)   During the hearing, Defendant Wheeler's only issue was the City's concern with the east basement wall, since it allowed water to penetrate into the basement, due in part to the slope toward the house of the east yard.

436)   After a brief exchange about the possibility of tabling the motion,  Commissioner Wilcox again reiterated that he had been on the property and that he didn't the water turned on, since that would allow Plaintiff to rent it, implying that he clearly knew that he was making Plaintiff's property worthless financially.

437)   Defendant Wheeler did not mention any other specific concerns during the March 6, 2023 "Show Cause" hearing as to what made the house unsafe.

438)   Thankfully, the City Commissioners were willing to give Plaintiff till May 15, 2023.

439)   However, they immediately passed Resolution 3345, which ordered the repair or demolition of the Property located at 200 E. Riley.

440)   Immediately after the "show cause" hearing, on the same evening of March 6, 2023, Counselor Werring sent the City an email confirming that the only thing Plaintiff needed to do was to repair the east basement wall so that water would no longer seep through into the basement.

441)   The same evening, Mr. Ryan, Plaintiff's Property manager, sent the City an email asking whether the City would approve a particular construction company in town to do any necessary repair work

442)   The next morning, however, Amy Finch, the City Manager, responded to Werring's request and said that "it was clear there are foundation issues, including the east wall, termite damage to floor joists, issues with the slope and drainage of the lot layout, and plumbing issues."

---

wall, visually similar to the letter "r".  However, since the entire basement wall is plumb, no such westward shift ever occurred.  The whole account is absurd and contrary to basic laws of physics.

443)     Ms. Finch's comment to these numerous issues, however, appear to be to the on-site meeting which occurred back in June of 2022, not to the "show cause" hearing that occurred the night before on March 6, 2023.

444)     During the "show cause" hearing, the only specific repair that Mr. Wheeler was concerned about was the east basement wall, which allowed water to penetrate into the basement in part due to the east yard's sloping toward the house.

445)     Ms. Finch then doubled down on the City's refusal to identify any concrete list of items needed to be repaired and noted that "This list is not all-inclusive, and an engineer needs to inspect the property . . .."

446)     Unsurprisingly, the City failed to respond to Mr. Ryan's query as to whether the City would recognize a particular construction company as competent to do an inspection and / or repair of the east basement wall.

447)     Again, if the City were genuinely trying to help Plaintiff to bring the Riley Property up to a safe condition, then why did no one in the City respond to Mr. Ryan's request about whether the City would accept the work of a particular company?

448)     On March 24, 2023, Plaintiff finally found a structural engineer willing to look at the Riley Property.

**RESOLUTION 3345**

449)     On the same day, March 7, 2023, Ms. Finch also sent a copy of Resolution 3345, giving notice that Plaintiff must either repair or remove the Subject Property by May 15, 2023.

450)     As the Court can by now surmise, Resolution 3345 provides no specific guidance as to what exactly needed to be repaired on the Subject Property.

451)     However, Resolution 3345 does specifically mention City's Housing Code, which is found in chapter 37.

452)     Moreover, chapter 37, § 37-34 also lays out specific factors pertaining to what makes a "dwelling unfit for human habitation."

453)     On March 24, 2023, Plaintiff finally found a structural engineer willing to look at the Riley Property.

454)     On March 28, Keith Finney, a structural engineer out of Topeka, inspected the Riley Property.

455)     A copy of his inspection report was attached to th Original Complaint as Exhibit 1.[73]

456)     Be it noted, however, that the engineer noted that his "only" concern was have the east yard regraded, which would thereby prevent any water from penetrating into the east basement wall.

457)     Mr. Finney noted that the east and west walls were plumb.

458)     Plumb walls give the lie to Defendant Wheeler's absurd claim that the ground water, coupled with freezing and thawing, somehow pushed an entire house over, off its original foundation.

459)     On May 4, 2023, Plaintiff had someone grade the yard, per the structural engineer's requirement.

460)     As of May 4,  the first five to seven feet (5-7') of yard immediately east of, and contiguous to, the house, now slopes away from the house, thereby allowing rain water to drain off to the back of the property, which should stop water penetrating into the basement.

---

[73] ECF No. 1, Ex. 1.

461)   Plaintiff incorporates all of the factual details in the Original Complaint regarding the timeline of events and the conversations that occurred regarding the Riley Property.[74]

## PUBLICATION OF RESOLUTIONS 3333 & 3345
## AND THE NEED TO HIRE A STRUCTURAL ENGINEER

462)   Thus far, Plaintiff has alleged that the City and its employees have acted *ultra vires* by (1) arbitrarily, capriciously, and maliciously denying water to the Riley Property; (2) arbitrarily and capriciously claiming that the house is unsafe when it wasn't; (3) conspiring amongst themselves to achieve a regulatory taking; (4) doing so for the ulterior goal of using eminent domain to acquire the Property to give it to another developer; and (5) violating federal, state, and local codes to do so.

463)   If Plaintiff is correct in his allegations, and the City knowingly did the aforementioned, then the City's decision to enact and publish the two Resolutions also, arguably, qualify as blackmail.

464)   For the City caused Plaintiff, on pain of tearing his house down, to hire a structural engineer.

465)   Which, based on Plaintiff's investigation, it has not required any other homeowner to do.

466)   And the City did so by defaming Plaintiff by publishing in the City newspaper that he owned a house that was unsafe for human habitation.

467)   There is no telling how much damage Plaintiff, a local landlord with 23 other houses, has suffered by the publication that one of his houses is unsafe for habitation.

468)   Atchison is a small city, and Plaintiff has worked diligently over the years to provide quality rentals to the citizens of the City.

---

[74] ECF No. 1, nn. 66-208.

469)    As a small city, word spreads quickly amongst its inhabitants about the type of person any given landlord is, and the type of houses that he offers to rent to the citizens.

## CAUSES OF ACTIONS

470)    Plaintiff incorporates by reference all the causes of action alleged in the Original Complaint.[75]

### A.
### BLACKMAIL

471)    K.S.A. 21-5428 defines Blackmail as "intentionally . . . compelling or attempting to compel another to act against such person's will, by threatening to: (1) Communicate accusations or statements about any person that would subject such person . . . to public . . . contempt or degradation;

472)    *IF* Plaintiff's allegations about the City's nefarious motives are true, and the City had no good reason to do what it did, but did so to obtain Plaintiff's Property through eminent domain, then forcing Plaintiff to hire a structural engineer (especially when it has not made any other similarly situated person do so), and publishing that his rental unit is unsafe, then it seems that the City has committed blackmail.

### B.
### RICO & HOBBS

473)    Title 18, Chapter 96, §§ 1961-90 of the United States Code is commonly known as Racketeer Influenced and Corrupt Organizations (RICO).

---

[75] ECF. No. 1, nn. 209-356.

474)    Under 18 USCS § 1962 (c) " It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

475)    Under 18 U.S.C.A. § 1962(d) "it shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

476)    RICO defines "racketeering activity" to include "any act which is indictable under" the Hobbs Act as well as "any act or threat involving ... extortion ..., which is chargeable under State law and punishable by imprisonment for more than one year." §§ 1961(1)(A)-(B) (2000 ed., Supp. IV).

477)    The Hobbs Act, finally, criminalizes interference with interstate commerce by extortion, along with attempts or conspiracies, § 1951(a), extortion being defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right," § 1951(b)(2).[76]

478)    The necessary elements of a RICO cause of action include: (1) that the defendant agreed to commit the substantive racketeering offense through agreeing to participate in two racketeering acts; (2) that he knew the general status of the conspiracy; and (3) that he knew the conspiracy extended beyond his individual role.[77]

479)    Although municipalities, *qua* municipalities, may not have the necessary intent to commit a RICO violation,[78] not all courts agree.[79]

---

[76] *Wilkie v. Robbins*, 127 S.Ct. 2588, 2605, (U.S.,2007)

[77] *United States v. Rastelli*, 870 F. 2d 822, 828 (2d Cir.), *cert. denied*, 493 U.S. 982, (1989).

[78] *See, e.g., Nu-Life Constr. Corp. v. Board of Educ.*, 779 F. Supp. 248, 252, (E.D.N.Y. 1991).

[79] *See Gingras v. Think Fin., Inc.*, 922 F.3d 112, 124-25 (2d Cir. 2019) (criticizing courts, including *Nu-Life*, for exempting municipalities from RICO liability based on inability to form intent).

480)    If the Court agrees that the City or its employees acted *ultra vires*, either by denying him

water services for over a year and presenting made up evidence to convince the Commissioners

to adopt the two Resolutions, or in requiring Plaintiff to hire a structural engineer and

publishing his name in connection with the two Resolutions, then Plaintiff alleges that there is

enough evidence of RICO violations.

481)    However, if the acts in connection with the two Resolutions, qua acts of a legislative body,

are exempt, there may still be a RICO violation if, as Plaintiff has reluctantly came to believe,

a City official or employee fabricated or orchestrated the anonymous email to the Texas Board

of Law Examiners, as an attempt to undermine the present lawsuit.

482)    The Hobbs Act prohibits interference with interstate commerce by extortion, attempted

extortion, or conspiracy to commit extortion.[80]

483)    Extortion is defined in the Act as "the obtaining of property from another, with his consent,

induced by wrongful use of actual or threatened force, violence, or fear, or under color of

official right."[81]

## C.
## *MONELL* CLAIM

484)    As the Defendants pointed out in their Memorandum in Support of their Motion for Judgment

on the Pleadings,[82] *Monell* liability requires allegations of: (1) a municipal policy or custom; (2) a

direct causal link between the policy or custom and the injury alleged; and (3) deliberate

indifference on the part of a municipality "to an almost inevitable constitutional injury."

---

[80] 18 U.S.C. § 1951(a).
[81] *Id.*, § 1951(b)(2).  *See also Robbins v. Wilkie*, 433 F.3d 755, 768 (C.A.10 (Wyo.), 2006).
[82] ECF No. 17, at 36, (*citing Schneider v. City of Grand Junction Police Department*, 717 F. 3d 760, 769 (10th Cir. 2013)).

**Policy or Custom**

485)   Although Defendants attempted to prevent Plaintiff from getting numerous policy documents through his KORA Requests, he managed to obtain a couple of documents pertaining to City policies.

486)   One document is a Memo to Amy Finch from Phil Burke, dated July 7, 14, 2022, in which he attaches a "revision document that we reviewed previously in your office for final approval."[83]

487)   A second document shows a previous policy regarding when water service is allowed to be turned on, but which has a giant stamp at the bottom reading "VOID as of 7/14/2022."[84]

488)   Finally, a third document, presumably the new policy valid after July 14, 2022, has the following:  "Water service may be established once the plumbing system has been inspected and or tested as directed by the Building Inspector. . . . A final occupancy inspection is required prior to anyone living in the building. . . . Proper notice shall be given to all parties involved."[85]

489)   While the previous policy, which was valid prior to July 14, 2022, is not entirely clear, the new policy is noteworthy for the following three points:

490)   First, it repeats and clarifies what Plaintiff has argued in his Original Complaint, *viz.*, that the City Officials are to turn water service on once the "plumbing system has been inspected."

491)   There is nothing in the policy that permits or allows an official to keep water off if the building as a whole is unsafe.

---

[83] See Ex. 28.
[84] See Ex. 29.  This second document is entitled "Water Turn On Inspection Protocol 11-08-12."  It appears, however, to be only a portion of the entire policy.
[85] See Ex. 30.  Plaintiff infers that the third document is the new policy, since it is entitled "Water service revisions."

492)   Only if "the plumbing system is inspected and or tested as directed by the Building Inspector."[86]

493)   Second, a different and distinct, "final occupancy inspection" is required prior to anyone living in the building, but not before water service is to be turned on.

494)   Third, the policy directs that "Proper notice shall be given to all parties involved."

495)   There is another section, however, to the new policies, titled "Water services flagged for inspection" which states that: "When *complaints* are received on existing structures in regard to conditions, we will flag the water in the system to cause an inspection to be performed prior to transferring water service to another individual. The inspection should ensure that issues have been corrected. Violations of the minimum housing code shall be corrected to the satisfaction of the Building Inspector prior to occupancy and the return of water service." (emphasis added).

496)   Although this new policy specifically describes that water service may be denied, when *"complaints are received"* until "violations of the minimum housing code shall be corrected to the satisfaction of the Building Inspector prior to . . . the return of water service," there is no indication in Plaintiff's file that there were any, much less multiple, complaints about the Riley Property.

497)   Secondly, this added section seems to have only been put in place after July 14, 2022, whereas the denial of Plaintiff's water service began in March, 2022.

498)   Third, there is no indication that the new policy was adopted by the appropriate Ordinance.

---

[86] Interestingly, the policy doesn't even go as far as the Code, since it doesn't specify that the plumbing system must be up to Code, just that it must be inspected!

499) Regardless, as Plaintiff has shown through painstaking detail, the City has a history or custom of denying water service to Plaintiff, on at least three different occasions, without providing him proper notice, and on four occasions, of an opportunity to be heard.

500) Moreover, the City has a habit or custom of connecting the denial of water services to properties based on building Codes, whereas the

**Direct Causal Link Between The Policy Or Custom And The Injury Alleged**

501) Regarding the second element of a Monell claim, the City's habit of denying water service has directly caused Plaintiff to lose contracts or leases on at least three occasions: the first time at 106 N 10th years ago; a second time with regard to the house at 712 N 2nd, and for well over a year now with regard to the Riley Property.

**Deliberate Indifference To An Almost Inevitable Constitutional Injury**

502) The third element of a Monell claim has to do with a deliberate indifference to a constitutional injury.

503) Plaintiff has shown at length elsewhere that water service is a constitutional right protected by the Fourteenth Amendment.[87]

504) In all of the instances where Defendants denied water service to Plaintiff, they did so with a deliberate indifference to Plaintiff's constitutional rights.

505) This deliberate indifference is nowhere clearer than in the March 30, 2022 email from Burke to Wheeler, where Defendant Burke signed the email: Fuck him!

**D.
DEFAMATION**

---

[87] See ECF No. 19, at 4.  Plaintiff incorporates all of ECF No. 19.

506)   Plaintiff alleges that Defendants defamed him in the March 30, 2022 email.

507)   Defendants also defamed plaintiff by publishing Resolutions 3333 and 3345 in the local

newspaper.

**E.**
**NEGLIGENT HIRING, RETENTION, SUPERVISION, AND TRAINING**

508)   In addition to all of the foregoing, Plaintiff alleges that the City was negligent in its hiring,

Retention, Supervision, and Training.

509)   Repeatedly, Defendant Wheeler claimed that he was not a structural engineer and required

Plaintiff to hire one to say what was wrong with the Riley Property.

510)   The City owes its citizens a duty to hire, train, and supervise, qualified inspectors.

511)   To this date, to Plaintiff's knowledge, the City has done nothing to reprimand Defendant

Burke for his utter contempt he exhibited towards the Plaintiff in his March 30, 2022 email,

which has certainly come to light by now.

**PRAYER**

512)    WHEREFORE, Plaintiff seeks relief against the City and its employees as follows:

a)  Award declaratory and injunctive relief, specifically:  Declarative relief that the Riley

Property is safe and Injunctive relief enjoining the City to provide water services to the

Riley Property.

b)  Award compensatory damages for the lost profits to his Second St. Property and Riley

Property that resulted from the unjust deprivation of water services; the expenses of hiring

a contractor to do unnecessary repairs; the expense of hiring a structural engineer; and the

expense of having the yard regraded.  These damages are at least $10k and no more than

$50k.

c) Award relief to Plaintiff against City for violating his right to be free from unreasonable searches, unequal protection of the laws, and his right not to have his property taken without due process by compensating Plaintiff at a sum at least of $500k.

d) Award relief to Plaintiff against City for Monell violations, blackmail, Hobbs' Act, and other federal violations, in an amount not less than $500k.

e) Award compensatory damages for defamation and the intentional infliction of emotional distress in an amount not less than $500k.

f) Award punitive damages for conspiring the regulatory taking that occurred to his Riley Property in an amount not less than $500k.

g) Award treble damages for RICO violations.

h) Award any and all other forms of relief that are permissible in law or in equity.

513) Plaintiff requests that the case be tried in Kansas City, Kansas.


JURY TRIAL DEMANDED


Respectfully submitted to the Court,

/s/ *Lloyd A. Newton*
Lloyd A. Newton
1859 W. Summit Ave.
San Antonio, Texas 78201
(913) 426-3710
Lnewton@stmarytx.edu

## CERTIFICATE OF SERVICE

I, Lloyd A. Newton, hereby certify that a true and correct copy of the foregoing has been served in accordance with the Federal Rules of Civil Procedures to the person(s) listed below and in the manner(s) listed below on this the 27th day of June, 2023.

Mr. Michael K Seck                          Sent Via Email: mseck@fpsslaw.com
Fisher Patterson Sayler & Smith, LLP
9393 West 110th Street, Suite 300
Building 51, Corporate Woods
Overland Park, Kansas  66210


Attorney for Defendants
City of Atchison,
Lisa Moody, Mayor,
Curtis Wheeler, Code Compliance,
Phil Burke, Code Compliance.


/s/ *Lloyd A. Newton*
Lloyd A. Newton